IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | | |
|---|---|---|---|
| Brazil M. Lee, | : | | |
| Plaintiff | : | Civil Action 2:11-cv-1149 | |
| v. | : | Judge Watson | |
| Michael J. Astrue, | : | Magistrate Judge Abel | |
| Commissioner of Social Security, | | | |
| Defendant | : | | |

## REPORT AND RECOMMENDATION

Plaintiff Brazil M. Lee brings this action under 42 U.S.C. §§405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security denying her application for Supplemental Security Income benefits. This matter is before the Magistrate Judge for a report and recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.**

Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The mental residual functional capacity formulated by the administrative law judge is not supported by substantial evidence; and,
- The administrative law judge's failure to recognize Raynaud's phenomenon[1] as a severe impairment was erroneous.

---

[1]Reynaud's phenomenon is "a condition in which cold temperatures or strong emotions cause blood vessel spasms that block blood flow to the fingers, toes, ears, and nose." MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/000412.htm (Accessed September 21, 2012)."Strong emotions or exposure to the cold causes the fingers, toes, ears, or nose to become white, then turn blue. When blood flow returns, the area becomes red and then later returns to normal color. The attacks may last from minutes to hours." *Id.*

**Procedural History.** Plaintiff Brazil M. Lee filed her application for disability insurance benefits on September 15, 2006, alleging that she became disabled on January 1, 2006, at age 41, by Raynaud's disease, autoimmune disease, Sjogren's syndrome, rheumatoid arthritis, depression, memory loss, chronic pain, circulation loss, chemical allergies, food allergies, vitiligo of skin, and cervical stenosis. (R. 177, 181.) The application was denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge. On October 28, 2010, an administrative law judge held a hearing at which plaintiff, represented by counsel, appeared and testified. (R. 64.) A vocational expert and a medical advisor also testified. On July 28, 2010, the administrative law judge issued a decision finding that Lee was not disabled within the meaning of the Act. (R. 18.) On November 16, 2011, the Appeals Council denied plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security. (R. 1.)

**Age, Education, and Work Experience.** Brazil M. Lee was born August 17, 1964. (R. 177.) She has a high school education and completed one year of college. (R. 188.) She has worked as a animal care handler, dancer, mail clerk, package handler and stock person. She last worked October 6, 2006. (R. 181.)

**Plaintiff's Testimony.** Plaintiff testified that she graduated from high school but she flunked out of college her first year. She lived with her stepmother and at a friend's house. She drove a car approximately twice a week to the store. Once every two weeks, she went to a park where she walked.

2

She has had allergic reactions to her medications. She developed an ulcer as a side effect of her medications. She also broke into a rash.

She could only walk for or five minutes before needing a break. She could be on her feet for a total of about an hour. With breaks, she could sit for a couple of hours. With her left hand, she could carry a gallon of milk.

In 2006, she was in treatment for a year. She stopped treatment when she could no longer afford it. She recently began treatment again because she had insurance.

She slept inconsistently. She usually woke up at 8:00 a.m. She ate breakfast and tried to walk if she could. If she could not walk, she slept or watched television. Her friend and sister performed household chores for her. Lee also testified that she was not comfortable being around people.

She had to soak her hands to increase circulation and to relieve the numbness. She took medication to improve her circulation. She no longer used the computer because it was too hard to see and to control it. The numbness in her hands started seven or eight years ago, and it has become increasingly worse. Small tasks like opening things or flipping things are difficult for her. She cannot fix her hair or tie her shoes anymore. She had a special, big pen that she could use to write.

Plaintiff experienced panic attacks. She can go several weeks without having one, but at times she had several panic attacks in a week. She was uncomfortable in small spaces, like elevators, or around crowds. She had crying spells. She had difficulty eating. Her medications made her groggy and sleepy. She had mood swings.

Lee had constant nerve pain in shoulders, hips, and in the center of her back. It felt like fire. A hot bath provided some relief. The amount of medication she had to take to alleviate the pain made her sick. She could not tolerate that amount of medication. The medications caused constipation, diarrhea, and vomiting. She also broke out in tiny bumps like a heat rash.

Lee slept only three or four hours a night. She had to keep moving or she would go numb. She had difficulty with her memory and concentration. (R. 70-94.)

**Medical Evidence of Record.**

**Physical Impairments.**

On July 1, 2001, Lee was treated at the emergency room for a strained neck following a motor vehicle accident. (R. 232-37.)

On February 12, 2005, plaintiff was seen for follow up care after twisting her knee. She reported a significant improvement in her pain. She was diagnosed with a medial meniscal tear with a healing MCL strain. (R. 259-60.)

On April 6, 2005, Lee was treated at the emergency room for a twisted knee. (R. 238-44.) On June 14, 2005, plaintiff was treated for a knee injury. (R. 261-62.)

<u>Marc A. Antonchak, M.D.</u> On August 15, 2005, Dr. Antonchak began treating plaintiff. Plaintiff Lee reported being diagnosed with vitiligo in 1992. She reported constipation. She was cold all the time and excessively tired. She reported right-sided chest pain and headaches. Dr. Antonchak diagnosed vitiligo. He wanted to rule out hypothyroidism given her history of autoimmune disease and constipation. He believed

4

that her headaches were vascular in nature. He also noted the presence of a left knee meniscal tear. (R. 256-58.)

An August 19, 2005 echo report was normal (R. 272-73.) On September 2, 2005, plaintiff had a normal chest x-ray. (R. 266.) A September 2, 2005 right upper quadrant ultrasound revealed no signs of cholelithiasis or cholecystitis. There were nonobstructing calculi within the right kidney. There were calcified granulomas within the right hepactic lobe. (R. 267-68.)

On September 19, 2005, plaintiff reported that her right-sided chest pain with radiation into her right shoulder had worsened. She reported that her hands turned blue and white when exposed to cold. Her salivary glands enlarge and squirt water when she pushes on them. Dr. Antonchak noted that Lee had done extensive reading on autoimmune diseases. (R. 254-55.)

On April 10, 2006, Dr. Antonchak examined plaintiff for follow up of dyspnea. (R. 251-52.) She reported continued shortness of breath and pressure on her chest. Dr. Antonchak noted that there was no identifiable cause of the dyspnea. Lee reported seeing a holistic medicine doctor who indicated that it could be due to a wheat allergy. Plaintiff believed that eliminating wheat had provided some relief. She reported ear ringing, "lymph nodes in her neck," occasional hypoglycemia, curled nails, and easily cold hands. (R. 251.) She had intermittent temperatures up to 103 degrees. She reported joint pain all over. She had headaches and "digestive pains." *Id.* She also experienced changes in her vision, dizziness, and an inability to sleep.

Dr. Antonchak diagnosed vitiligo, an autoimmune process, headaches, and Raynaud's phenomenon. He wrote, "[s]he gives a good history of Raynaud's phenomenon where her fingers turn really red, then white to blue. She is well-read on this subject but she claims [this] happens to her especially when going outside. We discussed starting short acting nifedipine 30 mg daily for her Raynaud and see if this gives her any relief." (R. 252.)

<u>Teresa M. George, M.D.</u> On May 2, 2006, Dr. George performed a consultative examination. Plaintiff reported that she developed vitiligo at age 17. A year ago, she developed joint pain in her left shoulder and bilateral hip region. Plaintiff also complained of dry eyes, dry mouth, and Raynaud's phenomenon. An initial laboratory evaluation showed a positive ANA, positive rheumatoid factor, positive SSA, positive SSB, elevated sedimentation rate and increased total protein with a polyclonal hypergammaglobulinemia. On physical examination, she had synovitis and vitiligo. Dr. George suspected plaintiff had Sjogren's syndrome, but she could not rule out early rheumatoid arthritis. (R. 246-48.)

<u>Sandra M. Pinkham, M.D.</u> Dr. Pinkham began treating plaintiff on January 20, 2006. Plaintiff had an autoimmune disease. She had had migraines and injured her knee. After ongoing many tests, she had more joint pain in her hips and shoulders. She had migraines, severe headaches, light sensitivity, vomiting, and diarrhea. Dr. Pinkham recommended several dietary changes including eliminating wheat. (R. 293-94.)

6

Dr. Pinkham had seen plaintiff only once at the time she completed a questionnaire for the Rehabilitation Services Commission. Dr. Pinkham noted that plaintiff had autoimmune problems, headaches, and joint pain in her knee, hips, and shoulders. Plaintiff was not limited in her motion in the joints or spine. She could perform fine and gross manipulation. Her gait was described as okay but she had pain with walking. (R. 291-92.)

<u>Jeffrey Vasiloff, M.D.</u> On December 19, 2006, Dr. Vasiloff, a state agency physician, reviewed the medical record and completed a physical residual functional capacity assessment Dr. Vasiloff opined that plaintiff could occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds. She could stand and/or walk about 6 hours in an 8-hour day. She could sit for a total of about 6 hours in an 8-hour day. She was unlimited in her ability push and/or pull. Dr. Vasiloff determined that plaintiff's allegations of limitations appeared credible in nature but exaggerated in degree. (R. 326-33.)

On May 10, 2007, Maria Congbalay, M.D. reviewed the evidence of record and the December 19, 2006 assessment and concurred in the findings. (R. 357.)

<u>Kevin Hackshaw, M.D.</u> On August 9, 2006, Dr. Hackshaw evaluated plaintiff at the arthritis clinic. She had a history of autoimmune disorders. Her vitiligo had started to reverse with hyperpigmentation. An MRI documented Chiari I malformation. Her main symptoms were tiredness, sleeping for 10-12 hours but not getting restful sleep, and a lack of energy. (R. 360-61.)

On February 6, 2007, Dr. Hackshaw evaluated Lee. Dr. Hackshaw noted that Lee had a history of vitiligo, positive ANA, and Raynaud's. She also had secondary fibromyalgia, possibly related to an underlying Chiari malformation. Her joints hurt. When laying down, plaintiff had numbness all over and tingling in the legs. She had blurred vision. She had a history of positive SSA-SSB and dryness of the eyes, which he believed was a Sjorgen's component of her undifferentiated connective tissue disorder process. (R. 358-59.)

On August 20, 2007, plaintiff reported that she was concerned that her Raynaud's was worsening. On examination, her hands had good capillary refill. She described a sharp pain in her scalp consistent with fibromyalgia. (R. 393-94.)

On March 5, 2009, plaintiff complained of chest pain, shortness of breath, sleep difficulties, and ringing in her ears. (R. 395-96.)

<u>Marvin H. Thomas M.D.</u> On November 24, 2009, Dr. Thomas performed a rheumatological consultation. Her rheumatic symptoms were positive for dry mouth, dry eyes, and butterfly rash. She had variable morning stiffness and night pain. She had numbness and tingling in her hands. (R. 392.)

On April 27, 2010, plaintiff complained that her medication had given her rash. Plaintiff reported continued symptoms of Raynaud's although she did not have any ulcerations. She reported having dry mouth and dry eyes. She also complained of fatigue. Plaintiff showed Dr. Thomas a photograph which was "somewhat certainly" consistent with Raynaud's and a photo of a rash, which may have had autoimmune

8

characteristics. Dr. Thomas believed that she had Sjogren's primarily and Raynaud's although it was not typical. He believed that fibromyalgia was the source of plaintiff's pain. (R. 390-91.)

**Psychological Impairments.**

Scott Lewis Donaldson, Ph.D. On December 12, 2006, Dr. Donaldson, a psychologist, evaluated Lee. On mental status examination, Lee exhibited flat affect with an anxious mood. Her eye contact was minimal. She reported a poor appetite and having lost thirty pounds. Her sleep was also poor. She was tearful three to four times a week. She felt helpless and hopeless. She suffered from mood swings and symptoms of depression. She had diminished interest in activities, psychomotor retardation, fatigue, and a lack of concentration. Lee reported suffering from anxiety and undue worry about her health. She was restless, edgy, fatigued, and irritable.

Dr. Donaldson diagnosed a mood disorder, not otherwise specified and generalized anxiety disorder. He assigned a Global Assessment of Functioning ("GAF") score of 50-60. Dr. Donaldson opined that plaintiff's ability to understand, remember and carry out one- and two-step job instructions may be weak, but not impaired. Her ability to perform repetitive tasks may be limited moderately due to chronic pain; however, her level of motivation may be lacking moderately due to her mood and anxiety disorders. Her ability to attend to relevant stimuli was likely mildly impeded. Her interpersonal relationship skills and her ability to relate to supervisors and co-

workers was mildly limited. Her ability to withstand the stress and pressures associated with day-to-day work activity appears to be moderately limited. (R. 301-07.)

<u>Irma Johnston, PSAT</u> On December 13, 2006, Dr. Johnston completed a psychiatric review technique and mental residual functional capacity assessment. Dr. Johnston indicated that plaintiff was diagnosed with borderline intellectual functioning, a mood disorder, not otherwise specified and a generalized anxiety disorder.

Dr. Johnston noted plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. She had no episodes of decompensation.

With respect to understanding and memory, plaintiff was moderately limited in her ability to understand and remember detailed instructions. With respect to sustained concentration and persistence, plaintiff was moderately limited in her abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain a regular attendance, and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was markedly limited in her ability interact appropriately with the general public. With respect to adaption, plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting.

10

Dr. Johnston found plaintiff's allegations to be credible. She opined that plaintiff was capable of simple, repetitive tasks in a low stress environment, with few co-workers, and where interactions with co-workers and supervisors were minimal and superficial. (R. 308-24.)

On May 1, 2007, Caroline Lewin, Ph.D. reviewed the December 12, 2006 mental residual functional capacity assessment and concurred in the findings. (R. 356.)

Jeffrey Lodge, M.D. On December 9, 2009, Dr. Lodge, a psychiatrist, began treating plaintiff. Dr. Lodge diagnosed plaintiff with bipolar disorder. He noted symptoms of depression, mania, poor concentration, loss of interest, loss of energy, poor motivation and anxiety. He assigned a GAF score of 60. (R. 403-09.)

**Medical expert.**

At the hearing before the administrative law judge, Dr. Ronald Kendrick, a board certified orthopedic surgeon, testified as a medical expert. He said that the diagnoses documented by objective medical evidence of record were fibromyalgia, an unclassified autoimmune disorder, and a mood disorder. June 17, 2010 Hearing, Doc. 9-2, PageID ## 129-30. Dr. Kendrick stated the opinion that plaintiff Lee's pain limited to lifting up to 10 pounds occasionally and 5 pounds frequently. She could stand or walk for 30 minutes at a time for a total of 2 hours during an 8 hour work day. She could set for 1 hour at a time for at least 6 hours a day. She was limited to occasional stooping, kneeling, crawling and bending. *Id.*, PageID # 131. She retained the ability to work an 8 hour day, 5 days a week. *Id.*, PageID # 132.

11

Dr. Kendrick testified that there is no medical test for Raynaud's phenomenon. It can only be verified by observation. Warm water will usually reverse the symptoms. *Id.*, PageID ## 133-35.

**<u>Administrative Law Judge's Findings</u>**.

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2. The claimant has not engaged in substantial gainful activity since January 1, 2006, the alleged onset date (20 CFR §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the severe impairments best described as: fibromyalgia; autoimmune disorder, unclassified; mood disorder with anxiety; and borderline intellectual functioning (20 CFR §§ 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404/1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

    After careful consideration of the entire record, it is found that the claimant has the residual functional capacity to perform less than the full-range of "sedentary" work as defined in 20 CFR §§ 404.1567(a) and 416.967(a) in that she has the following abilities and limitations: (1) able to lift five pounds frequently and 10 pounds occasionally; (2) able to sit for one hour at a time for a total of six hours in an eight-hour workday; (3) able to stand and walk for 30 minutes each at a time for a total of two hours in an eight-hour workday; (4) able to stoop, kneel, crouch and crawl only occasionally; (5) must avoid work environments under 40 degrees Fahrenheit; (6) able to understand, remember and carry out one- or two-step job instructions; (7) moderate limitations on her ability to perform repetitive tasks; (8) mild limitations on her interpersonal relationship skills and ability to relate to supervisors and co-workers; and (9) moderate limitations on her ability to withstand

> the stress in the work place, which is defined as impacting on her ability to perform work with production quotas and time pressures.
>
> 5. Thee claimant is unable to perform any past relevant work (20 CFR §§ 404.1565 and 416.965).
>
> 6. The claimant was born on August 17, 1964 and was 41 years old, which is defined as a "younger individual" age 18-44, on the alleged disability onset date (20 CFR §§ 404.1563 and 416.963).
>
> 7. The claimant has at least a high school education and is able to communicate in English (20 CFR §§ 404.1564 and 416.964).
>
> 8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is "unskilled" (20 CFR §§ 404.1568 and 416. 968).
>
> 9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR §§ 404.1569, 404.1569(a), 416.969, and 416.969(a)).
>
> 10. The claimant has not been under a disability, as defined in the Social Security Act, from January 1, 2006, through the date of this decision (20 CFR §§ 404.1520(g) and 416.920(g)).

(R. 11-17.)

**Standard of Review**. Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" *Id*. *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole.

*Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.** Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- <u>The mental residual functional capacity formulated by the administrative law judge is not supported by substantial evidence</u>. Plaintiff argues that the vocational expert's response to the hypothetical question posed by the administrative law judge does not constitute substantial evidence that other jobs could be performed because the administrative law judge improperly defined the term "moderate" limitation. Plaintiff maintains that a "moderate" limitation significantly limits the ability to do basic work activities. The administrative law judge defined moderate as more than a slight limitation in the area, but the individual is still able to function satisfactorily. This definition eliminated any difference between mild and moderate limitations. Plaintiff also argues that the mental residual functional capacity formulated by the administrative law judge fails to explain what Lee can and cannot do under its

14

limitations. The administrative law judge asked the vocational expert separate hypothetical questions based on the state agency MRFC and the examination report of the consulting physician, but he did not ask the vocational expert to consider the two reports in tandem. The administrative law judge also gave equal weight to the opinions despite the fact that there were inconsistent findings contained within them. No attempt was made to resolve contradictions within the reports with respect to Lee's ability to understand, remember and carry out one- or two-step job instructions. Lee also argues that the administrative law judge violated Social Security Rule 96-6p by failing to evaluate the evidence produced by her treating mental health source that rendered the opinion of a non-examining physician out of date.

- <u>The administrative law judge's failure to recognize Raynaud's phenomenon as a severe impairment was erroneous</u>. Plaintiff maintains that the statement of the medical expert and treating physicians' observations are more nuanced than the administrative law judge acknowledged. The medical expert indicated that there were no objective tests documenting Raynaud's phenomenon; it simply had to be observed by the physician. The administrative law judge ignored the fact that plaintiff's treating doctor indicated that plaintiff showed him a photograph consistent with Raynaud's phenomenon. Plaintiff maintains that the administrative law judge's

15

conclusion that plaintiff's research was the basis for symptom magnification was erroneous.

**Analysis.** Plaintiff argues that the administrative law judge failed to properly define what constituted moderate limitations in posing her hypothetical question to the vocational expert. At the hearing, the administrative law judge stated, "moderate means that she could be doing repetitive tasks for at least up to a third of the workday or more. . . . I think that's how Social Security defines it." (R. 109.) She further elaborated by saying that an individual with moderate limitations would still be able to function satisfactorily. With that definition of moderate limitations, the vocational expert testified that plaintiff could perform approximately 50% of sedentary, unskilled jobs. The administrative law judge adequately distinguished between slight, moderate, and marked limitations.

Plaintiff also argues that the administrative law judge failed to combine the limitations identified by Dr. Johnston and Dr. Donaldson when formulating a residual functional capacity assessment. Dr. Donaldson opined that plaintiff's ability to understand, remember and carry out one- or two step job instructions was not impaired. Her ability to perform repetitive tasks was moderately limited due to her chronic pain. Her ability to attend to relevant stimuli was mildly impeded. Her ability to withstand the stress and pressures associated with day-to-day work activity was moderately limited. Dr. Johnston opined that plaintiff was capable of simple, repetitive

tasks in a low stress environment, with few co-workers, and where interactions with co-workers and supervisors were minimal and superficial. (R. 308-24.)

The administrative law judge concluded that plaintiff's mental impairments resulted in the following mental residual functional capacity: able to understand, remember and carry out one- or two-step job instructions; moderate limitations on her ability to perform repetitive tasks; mild limitations on her interpersonal relationship skills and ability to relate to supervisors and co-workers; and moderate limitations on her ability to withstand the stress in the work place, which is defined as impacting on her ability to perform work with production quotas and time pressures. Plaintiff has not identified any limitation found by Dr. Donaldson or Dr. Johnston that is not adequately accounted for in the residual functional capacity formulated by the administrative law judge. As a result, the administrative law judge's residual functional capacity is supported by substantial evidence.

Plaintiff further argues that the administrative law judge improperly relied on Dr. Johnston and Dr. Donaldson's opinions despite the fact that medical evidence was submitted after these assessments were written. On December 9, 2009, Dr. Lodge began treating plaintiff's bipolar disorder. Dr. Lodge noted symptoms of depression, mania, poor concentration, loss of interest, loss of energy, poor motivation and anxiety. He assigned a GAF score of 60. (R. 403-09.) Plaintiff fails to identify how Dr. Lodge's treatment notes discredit the conclusions reach by Dr. Johnston and Dr. Donaldson. The

administrative law judge reviewed the treatment notes of Dr. Lodge and concluded that the assessments of Dr. Donaldson and Johnston were entitled to great weight.

Raynaud's Phenomenon. The administrative law judge stated:

> As to her alleged hand condition, it is acknowledged that there are some references in the claimant's medical record in which the claimant's treating physicians state that the claimant's report to hem of her alleged symptoms "sound like Raynaud's phenomenon" and that "she gives a good history of Raynaud's phenomenon" (Exhibit 3F). However, it is found that the claimant's allegations as to her hand condition, symptoms and limitations are not credible to the extent that they are inconsistent with the above residual functional capacity, particularly in light of the following: (1) the claimant's testimony that she suffers constant weakness and numbness in her hands, in May 2006 the claimant reported to her health care provider that "she has numbness in her fingers when she the Raynaud's but otherwise denied any weakness, numbness or tingling (Exhibit 3F); (2) April 2006 treatment records indicate that the claimant is well-read on the subject of Raynaud's phenomenon (Exhibit 3F), which in turn begs the question of whether there is some symptom magnification in light of her readings; (3) an examining physician has observed that the claimant showed good capillary refill of the hands (Exhibit 18F); (4) a treating physician noted that the claimant's ability to do fine and gross manipulation is "ok" (Exhibit 4F); and (5) Dr. Ronald E. Kendrick, M.D., who reviewed the entire record, testified as an impartial medical expert that there exists no objective medical evidence in the record, in terms of treating physician's observations, to confirm the diagnosis of Raynaud's phenomenon.

(R. 15.) Plaintiff points to the testimony of the medical expert, who indicated that there is no objective test for diagnosing Raynaud's phenomenon other than direct observation of the discoloration and that she showed her physician a photograph of her hands to demonstrate her symptoms.

Here, the administrative law judge did not err in declining to find that Raynaud's phenomenon was a severe impairment. The administrative law judge properly

18

considered plaintiff's allegations concerning her hands in formulating a residual functional capacity. The administrative law judge relied on substantial evidence in the record to determine that plaintiff's alleged impairment did not impact plaintiff's ability to work. Any error in classifying the impairment as non-severe was harmless. The evidence of record supports a finding that plaintiff had no manipulative limitations.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.** It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

                                          s/Mark R. Abel
                                          United States Magistrate Judge